**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AON PLC, a United Kingdom public limited company, AON GROUP, INC., a Maryland Corporation, | |
| Plaintiffs, | |
| v. | Case No. **1:16-cv-1924** |
| MICHAEL HEFFERNAN, and ALLIANT INSURANCE SERVICES, INC., a Delaware Corporation, | (Jury Demanded) |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION OF
PLAINTIFFS AON PLC AND AON GROUP, INC. FOR
<u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

Shand S. Stephens (*pro hac vice* pending)
Anthony Coles (*pro hac vice* pending)
DLA Piper LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York 10020
T: 212.335.4500
shand.stephens@dlapiper.com
anthony.coles @dlapiper.com

John J. Hamill (ARDC No. 6217530)
Joseph A. Roselius (ARDC No. 6300703)
DLA Piper LLP (US)
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
T: 312.368.4000
john.hamill@dlapiper.com
joseph.roselius@dlapiper.com

Counsel for Plaintiffs Aon plc and Aon Group, Inc.

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT .................................................................................. 1

II.     FACTUAL BACKGROUND ..................................................................................... 4

    A.    Heffernan Has Contractual and Fiduciary Duties to Aon ...................................... 4

    B.    On the Eve of Departure, Heffernan Downloaded Trade Secret and
        Confidential Data Without an Aon Business Justification ...................................... 5

III.    ARGUMENT ........................................................................................................... 8

    A.    Aon Is Likely to Succeed on Breach of Contract Claims Against
        Heffernan ................................................................................................................ 8

    B.    Aon Is Likely to Succeed on Breach of Fiduciary Duty and/or Duty of
        Loyalty Claims Against Heffernan ...................................................................... 10

    C.    Aon Is Likely to Succeed on Aiding and Abetting Breach of Fiduciary
        Duty Claims Against Alliant ............................................................................... 11

    D.    Aon Is Likely to Succeed on Misappropriation of Trade Secret Claims ............. 12

    E.    Unless Enjoined, Defendants' Conduct Will Irreparably Harm Aon .................. 13

    F.    The Balance of Hardships Weighs in Aon's Favor and Would Not Harm
        the Public Interest ................................................................................................ 14

    G.    Aon Has No Adequate Remedy at Law ............................................................... 15

IV.     CONCLUSION ...................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*Alpha School Bus Co., Inc. v. Wagner*,
  910 N.E.2d 1134 (1st Dist. 2009) .........................................................................10

*Aon Corp. v. Alliant Ins. Serv., Inc.*,
  2014 NY Slip Op 31735(U), 2014 WL 2990393 (Sup. Ct., N.Y. Cnty., June 26, 2014) .........3

*Aon Risk Services Northeast v. Cusack*,
  2011 WL 6955890 (N.Y. Sup. Ct., Dec. 20, 2011) ....................................................8, 11, 12

*Aon Risk Servs. v. Cusack*,
  No. 651673/11, 34 Misc.3d 1205(A), 2011 WL 6955890 (Sup. Ct. N.Y. Cnty. Dec.
  20, 2011) ..................................................................................................................3

*Aon Risk Servs. v. Cusack*,
  102 A.D.3d 461, 958 N.Y.S.2d 114 (N.Y. App. Div. 1st Dep't 2013)..........................4, 8, 13

*Aon v. Utley*,
  863 N.E.2d 701 (Ill. App. Ct. 2006) ............................................................................9

*Arpac Corp. v. Murray*,
  589 N.E.2d 640 (Ill. App. Ct. 1992) ............................................................................9

*Caterpillar Inc. v. Jerryco Footwear, Inc.*,
  880 F. Supp. 578 (C.D. Ill. 1994) ..............................................................................15

*Cumulus Radio Corp. v. Olson*,
  80 F. Supp. 3d 900, 912 (C.D. Ill. 2015) ...................................................................13

*Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*,
  420 F. Supp. 2d 866 (N.D. Ill. 2006) .........................................................................14

*Donald McElroy, Inc. v. Delaney*,
  389 N.E.2d 1300 (Ill. App. Ct. 1979) ..........................................................................9

*Donald McElroy, Inc. v. Delaney*,
  72 Ill. App. 3d 285 (1979) .........................................................................................14

*Duct-O-Wire Co. v. U.S. Crane, Inc.*,
  31 F.3d 506 (7th Cir. 1994) .......................................................................................14

*Dunkin' Donuts Inc. v. Kashi Enters., Inc.*,
  106 F. Supp. 2d 1325 (N.D. Ga. 2000) ......................................................................15

*Eichmann v. Natl. Hosp. & Health Care Servs., Inc.*,
  719 N.E.2d 1141 (Ill. App. Ct. 1999) ....................................................................9

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir.2011) ...................................................................................8

*Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*,
  35 F.3d 1134 (7th Cir.1994) .................................................................................13

*Hanley v. Trendway Corp.*,
  953 F. Supp. 232 (N.D. Ill. 1996) ..........................................................................8

*Intertek USA, Inc. v. AmSpec, LLC*,
  No. 14 CV 6160, 2014 WL 4477933 (N.D. Ill. Sept. 11, 2014)......................12, 13

*Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc.*,
  834 F. Supp. 683 (D.N.J. 1993) ...........................................................................14

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*,
  342 F.3d 714 (7th Cir. 2003) ................................................................................12

*Malone v. Cort Furniture Corp.*,
  2002 WL 1874819 (N.D. Ill. Aug. 13, 2002) ...........................................................9

*McRand, Inc. v. van Beelen*,
  138 Ill. App. 3d 1045 (1985) ................................................................................14

*Midwest Television, Inc. v. Oloffson,*
  699 N.E.2d 230 (Ill. App. Ct. 1998) ........................................................................9

*Millard Maint. Serv. Co. v. Bemero*,
  566 N.E.2d 379 (Ill. App. Ct. 1990) ........................................................................9

*Muzumdar v. Wellness Int'l Network, Ltd.*,
  438 F.3d 759 (7th Cir. 2006) ..................................................................................8

*Neade v. Portes*,
  739 N.E.2d 496 (Ill. 2000) ...................................................................................10

*PepsiCo, Inc. v. Redmond*,
  54 F.3d 1262 (7th Cir. 1995) ................................................................................13

*Scranton Gillette Comms., Inc. v. Dannhausen*,
  1999 WL 558134 (N.D. Ill. July 27, 1999)........................................................10, 11

*Stuller, Inc. v. Steak N Shake Enterprises, Inc.*,
  695 F.3d 676 (7th Cir. 2012) ..................................................................................8

*Thornwood, Inc. v. Jenner & Block*,
   799 N.E.2d 756 (Ill. App. Ct. 2003) ...................................................................11

*Tomei v. Tomei*,
   602 N.E.2d 23 (Ill. App. Ct. 1992) .......................................................................9

*Tower Oil & Tech. Co., Inc. v. Buckley*,
   425 N.E.2d 1060 (Ill. App. Ct. 1981) ...................................................................9

*Ty, Inc. v. Jones Grp., Inc.*,
   237 F.3d 891 (7th Cir. 2001) ................................................................................8

*Unichem Corp. v. Gurtler*,
   498 N.E.2d 724 (Ill. App. Ct. 1986) ...............................................................10, 11

*Wessel Co. v. Busa*,
   328 N.E.2d 414 (Ill. App. Ct. 1975) .....................................................................9

*Wolf & Co. v. Waldron*,
   366 N.E. 2d 603 (Ill. App. Ct. 1977) ....................................................................9

## STATUTES

735 ILCS 1065/1 ....................................................................................................12

735 ILCS 1065/3 ....................................................................................................12

765 ILCS 1065/2(d) ...............................................................................................12

Plaintiffs Aon plc and Aon Group, Inc. ("Aon") submit this Memorandum of Law in support of their Emergency Motion for Temporary Restraining Order and Preliminary Injunction.

## I.     PRELIMINARY STATEMENT

Aon and Defendant Alliant Insurance Services, Inc. ("Alliant") are competing insurance brokerage firms.   Aon seeks emergency injunctive relief against (i) Defendant Michael Heffernan, former Executive Vice President and Regional Managing Director of Aon's San Jose office, and (ii) his new employer, Alliant, to halt their ongoing unlawful raid on Aon's San Jose, California office.   On January 26, 2016, after planning and conspiring with Alliant, Heffernan resigned without notice, and executed an orchestrated raid on Aon's San Jose office.   In less than 24 hours, 26 San Jose employees resigned Aon for Alliant, leaving only five in the office. Defendants are now targeting Aon's San Jose client base, taking clients and business Aon spent over 20 years developing.   Moreover, on the eve of his departure, without any legitimate business reason, Heffernan downloaded a trade secret report containing proprietary information that would be highly valuable to Alliant's operations.

The San Jose raid on Aon is the third by Alliant in the last four years.   In 2011 and 2014, Alliant perpetrated two almost identical, unlawful raids on Aon.   In each of these raids, Alliant solicited senior Aon executives and then worked secretly with them to organize a mass exodus of Aon employees, using Alliant's attorneys to file a declaratory relief action on behalf of the former Aon executives, prepared while they were still employed by Aon.

In June 2011, Alliant and Aon executive Peter Arkley conspired to and took 55 employees and over $20 million in revenue in three days from Aon's Southern California and Massachusetts operations.   Courts in both Illinois (Case No. 11 CH 21428, June 24, 2011 (Cook

1

County))[1] and New York issued three different temporary restraining orders and two preliminary injunctions against Alliant. The courts in both Illinois and New York found that Aon was likely to succeed on its claims of aiding and abetting breach of fiduciary duty, interference with contract, and interference with prospective economic advantage. In June 2013, Aon settled this litigation with Alliant for a substantial payment by Alliant to Aon and a stipulation to dissolve the injunctions. This settlement turned out to be the signal to Alliant to continue the raid.

In February 2014, just seven months after the settlement, Alliant raided Aon's Central California operations in Fresno, Salinas and Walnut Creek. Alliant worked secretly with John Day, the head of Aon's Central California operation, while Day was still on Aon's payroll, to organize a mass exodus of over 75 Aon employees in just two days, taking more than $14 million in business. Just as in 2011, Alliant's lawyers filed a declaratory relief action on behalf of Alliant and ten Aon executives on the same day the executives resigned. Aon brought a lawsuit in New York for this resumption of Alliant's 2011 raid. Just as in 2011, the New York Court issued a temporary restraining order and a preliminary injunction, finding again that Aon was likely to succeed on the merits of its claims for aiding and abetting its claims for breach of fiduciary duty, interference with contract, and interference with prospective economic advantage.

Two different New York Supreme Court justices, and the New York Appellate Division, have addressed Alliant and its tactics in written opinions. As to the 2011 raid, Justice Bernard Fried found:

---

[1] In the first stage of Alliant's raid on Aon in 2011, Aon brought an action in the Illinois Circuit Court of Cook County against Peter Arkley, other former Aon employees, and Alliant. On June 17, 2011, in that Illinois action, Aon sought and obtained a temporary restraining order ("TRO") preventing Alliant and other former employees from further soliciting Aon's clients and employees. On September 9, 2011, without reaching the merits of the action, or conducting a hearing on Aon's motion for a preliminary injunction, the Illinois court dismissed the action on *forum non conveniens* grounds, but left the TRO it had issued in effect for 30 days. Unlike the present case, Aon's claim in 2011 was not based on contracts with exclusive Illinois venue.

The coordinated departure of the Aon executives the morning of June 13, 2011, coupled with a request for a TRO in California within an hour of their resignations, followed by the mass exodus of Aon employees that same day, could not have happened without the prior planning by the former Aon executives and Alliant.

*Aon Risk Servs. v. Cusack*, No. 651673/11, 34 Misc.3d 1205(A), 2011 WL 6955890, at *10 (Sup.

Ct. N.Y. Cnty. Dec. 20, 2011).

As to the 2014 raid, Justice Marcy Friedman found:

It further strains credulity to suggest that 75 employees in the Aon Central California offices resigned and joined Alliant within one week without some orchestration from the departing senior employees and from Alliant.

\*　　\*　　\*

[I]t is not credible that senior management and all of the top producers in the Aon central California offices would resign from [Aon] on the same day without acting in concert. **Alliant's assistance in this departure is, in part, demonstrated through its filing of a declaratory judgment action on behalf of the former employees on the very same day. Alliant was seemingly willing and able to hire any Aon employee who wanted to join Alliant, leading to a mass exodus. The departure and hiring of over 75 plus employees could not have occurred without the active planning and participation of Alliant.**

(*Aon Corp. v. Alliant Ins. Serv., Inc.*, 2014 NY Slip Op 31735(U), 2014 WL 2990393, at *11

and *12 (Sup. Ct., N.Y., Cnty., June 26, 2014) (*emphasis added*.)

In July 2015, the New York Court granted Alliant's *forum non conveniens* motion and dismissed the New York action, which dissolved the New York preliminary injunction. Just six months later, on January 26, 2016, Alliant, for the third time, perpetrated a massive raid, this time on Aon's San Jose office, the subject of this motion. Just as in 2011 and 2014, Alliant's lawyers filed a declaratory relief action on behalf of Heffernan the same day he resigned. Just as in 2011 and 2014, dozens of Aon employees resigned in a single day and were hired by Alliant in assembly-line fashion. In addition to violating fiduciary duties and contracts, Alliant and Heffernan misappropriated Aon's valuable trade secret and confidential information. In other

words, the New York Appellate Division had it just right when it wrote about Alliant and former

Aon executive Peter Arkley in the appeal of one of the two New York preliminary injunctions:

> The record amply demonstrates that Arkley [and Alliant], when not subject to formal judicial restraint, has been inclined to solicit Aon's employees and customers, in addition to making apparent use of its proprietary and confidential information.

*Aon Risk Servs. v. Cusack*, 102 A.D.3d 461, 463, 958 N.Y.S.2d 114, 117 (1st Dep't 2013).

Aon seeks injunctive relief with respect to Alliant and Heffernan's statutory and common

law obligations and two of Heffernan's Aon contracts – the Aon Corporation 2011 Incentive

Plan Restricted Stock Unit Agreements dated March 29, 2013 and December 11, 2013 (together,

the "Stock Agreements"). Under the Stock Agreements, Heffernan promised not to solicit Aon's

clients or employees for two years after leaving Aon or to misuse Aon trade secrets or

confidential information. In exchange, he received valuable awards of Aon stock worth

hundreds of thousands of dollars.

## II.     FACTUAL BACKGROUND

### A.  Heffernan Has Contractual and Fiduciary Duties to Aon.

Until he resigned on January 26, 2016, Heffernan was the head of Aon's San Jose office

and Managing Director, Executive Vice President and Regional Managing Director of Aon CSG,

a division within Aon. As a senior executive, Heffernan was entrusted with Aon's business

relationships and trade secrets and confidential information. Heffernan was a highly-valued and

highly-compensated employee and received numerous incentive bonuses and stock awards

during his tenure at Aon. As a condition of receiving Aon stock awards, Heffernan signed Stock

Agreements on March 29, 2013 and December 11, 2013, which contain restrictive covenants

preventing him from soliciting Aon's clients or employees or misusing its trade secrets and

confidential information. Section 9(b) of the Stock Agreements prohibits Heffernan from

soliciting Aon clients or prospective clients for 2 years after his resignation. Section 9(c) of the Stock Agreements prevents Heffernan from soliciting Aon employees for 2 years after his resignation. Section 9(g) of the Stock Agreements prohibits Heffernan from misappropriating Aon trade secrets and confidential information. Section 9(f) of the Stock Agreements entitles Aon to injunctive relief where, as here, Heffernan breaches its provisions. Section 10(j) of the Stock Agreements provides that the agreements "shall be governed by and construed in accordance with the substantive laws of the State of Illinois." Section 10(k) of the Stock Agreements provides that venue for any legal proceedings relating to the Agreements shall be in Cook County, Illinois. (*See* Declaration of Todd Stevenson executed Feb. 2, 2016 ("Stevenson Decl.") ¶¶ 2-11, Ex. 1 & 2.)

### B. On the Eve of Departure, Heffernan Downloaded Trade Secret and Confidential Data Without an Aon Business Justification.

Two weeks prior to his resignation, without any justifiable business reason, Heffernan downloaded extensive trade secret and proprietary data from AonWrap®, a proprietary Aon software program used to administer Aon's Wrap-Up Insurance program. Wrap-up insurance is a risk management technique used by owners and contractors of construction projects to control total construction costs. A wrap-up policy consolidates insurance coverage for multiple general and subcontractors working on a project into one program negotiated, purchased and managed by a single sponsor. Wrap-Up insurance enables contractors and owners to achieve significant cost savings for insurance of a construction project, by essentially buying insurance coverage at a volume discount for all contractors that will be working on the project. (*See* Declaration of Victoria Gotch-Mesa executed Feb. 2, 2016 ("Gotch-Mesa Decl.") ¶¶ 2-8, 16-23; Declaration of Donna M. Allard-Flett executed Feb. 2, 2016 ("Allard-Flett Decl.") ¶¶ 3-7.)

5

Since 1998, Aon has used AonWrap® to compile, develop and analyze data related to insurance costs for construction projects that are part of its Wrap-Up Insurance Program. Aon does not sell AonWrap® in the marketplace. No Aon competitor has access to AonWrap® data, which includes robust historical data from 1998 to present. This is significant because without robust historical data, Alliant has a comparative disadvantage in generating accurate modeling and benchmarking for its customer's wrap-up insurance programs. (*See* Gotch-Mesa Decl. ¶¶ 2-8, 19; Allard-Flett Decl. ¶¶ 7, 15-18.)

Heffernan's job duties at Aon did not require use of AonWrap®. Indeed, approximately two years ago, Aon audited AonWrap® users and removed users that did not need access to perform their job functions, including Heffernan. On or around May 20, 2014, however, Heffernan aggressively petitioned to have his access reinstated. While normally this is not a reason to grant access, the head of Construction Wrap-Up agreed to grant read-only access as Heffernan would be working on an initiative that justified it. In January 2016, Heffernan again requested access to AonWrap®, two weeks before his resignation. (*See* Gotch-Mesa Decl. ¶¶ 10-15; Allard-Flett Decl. ¶ 19.)

Following the raid, Aon discovered that two weeks before he resigned, Heffernan logged into AonWrap® and downloaded a report containing extensive confidential and proprietary data not justified by any legitimate business purpose. The report contained 11 MB of trade secret data pertaining to Aon construction clients from 1998 to the present, amounting to 20,875 lines on an Excel spreadsheet, which was compiled at great expense to Aon. The report contains historical data related to construction projects performed by over 8,000 companies, allowing for sophisticated modeling and benchmarking, as well as confidential customer data, including

company names, contract values, payroll amounts, construction project types, and insurance policy rates. (*See* Gotch-Mesa Decl. ¶¶ 4, 16-19; Allard-Flett Decl. ¶¶ 7-8.)

The evidence shows Alliant and Heffernan are already using this information to unlawfully compete. Heffernan created a proposal while he was at Aon for a $280 million Wrap-up for an Aon client and set the fee. He is now presenting a competing proposal for Alliant on that same Wrap-up, unquestionably using the information he obtained while at Aon. (*See* Declaration of Raymond Morra executed Feb. 2, 2016 ("Morra Decl.") ¶ 2.)

It is clear Heffernan took the AonWrap data for Alliant's benefit. Given Heffernan's job responsibilities at Aon, there was no legitimate business reason for him to access or download such comprehensive data. Although brokers sometimes use historical data in selling a Wrap-Up Insurance, such data is far more narrowly tailored than the report that Mr. Heffernan generated. Moreover, brokers do not need to personally access AonWrap® in order to access historical data for sales, and indeed, Heffernan circumvented Aon protocols relating to obtaining historical Wrap-Up data. Further, this was the first time Heffernan had accessed AonWrap® since at least August 2015, meaning it wasn't a system he regularly used to perform his job duties. (*See* Morra Decl. ¶ 2; Gotch-Mesa Decl. ¶¶ 24-25; Allard-Flett Decl. ¶ 19.)

Email records from January 28, 2016, also demonstrate that Heffernan and Alliant are actively soliciting Aon clients to transfer their business from Aon to Alliant. (*See* Declaration of Paul Rodriguez executed Feb. 3, 2016 ("Rodriguez Decl.") ¶ 2 and Ex. 1.)

Moreover, Heffernan is trying to evade his duties to Aon and disguise his misconduct by directing others at Alliant to contact Aon clients. In a February 1, 2016 email, Heffernan admitted to one Aon client "I asked Anna to reach out to you, as I was under some limitations as to who I could and could not reach out to. To play it safe, Anna made the call and contacted

you." (*See* Declaration of Matt Anacker executed Feb. 3, 2016 ("Anacker Decl.") ¶¶ 2-3, Ex. 1.)
Heffernan's restrictive covenants bar him from "directly or indirectly" soliciting Aon clients.
(*See* Stevenson Decl. ¶¶ 7-9, Ex. 1 & 2.)

## III.   ARGUMENT

To obtain a preliminary injunction or TRO, the moving party must show (1) "some
likelihood of success on the merits";  (2) that it has "no adequate remedy at law"; and (3) that it
"will suffer irreparable harm if a preliminary injunction is denied." *Stuller, Inc. v. Steak N Shake
Enters., Inc.*, 695 F.3d 676, 698 (7th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th
Cir. 2011).  If the moving party meets these threshold requirements, the district court weighs the
balance of the harms, "assessing [4] whether the balance of harms favors the moving party or [5]
whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction
should be denied. *Ezell*, 651 F.3d at 694*; see also Stuller*, 695 F.3d at 698.  In balancing the
harms, the court applies a "sliding scale" analysis: "the more likely the plaintiff will succeed on
the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Ty, Inc.
v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

### A.  Aon Is Likely to Succeed on Breach of Contract Claims Against Heffernan

Heffernan breached the covenants not to solicit clients and employees and protecting
trade secrets and confidential information in his Stock Agreements.  In *Aon v. Cusack*, the New
York Supreme Court found virtually identical covenants between Aon and its former executives
were enforceable under Illinois law.  *See Aon Risk Services Northeast v. Cusack*, 2011 WL
6955890, at *12-16 (N.Y. Sup. Ct. Dec. 20, 2011).

Heffernan's Stock Agreements are controlled by Illinois law and contain mandatory
Illinois forum selection clauses.  Under Illinois law, choice of law and forum selection clauses
are enforceable.  *Hanley v. Trendway Corp.*, 953 F. Supp. 232, 235 (N.D. Ill. 1996); *Muzumdar*

*v. Wellness Int'l Network, Ltd.*, 438 F.3d 759, 761 (7th Cir. 2006). In *Aon v. Utley*, 863 N.E.2d 701 (Ill. App. Ct. 2006), the Illinois Appellate Court found Illinois forum selection clauses in Aon's contracts with employees were enforceable against California employees. *Id.* at 706-08.

Under Illinois law, covenants not to compete are enforceable as long as they are (1) reasonable in scope; and (2) necessary to protect a legitimate business interests. *Millard Maint. Serv. Co. v. Bemero*, 566 N.E.2d 379, 384 (Ill. App. Ct. 1990). Here, the two-year time periods in the covenants are reasonable. *See Midwest Television, Inc. v. Oloffson,* 699 N.E.2d 230, 235 (Ill. App. Ct. 1998) (two years permissible); *Tomei v. Tomei,* 602 N.E.2d 23, 26-27 (Ill. App. Ct. 1992). Further, the fact the covenants lack geographic limits does not render them unenforceable because they only prohibit solicitations of Aon clients. *Eichmann v. Natl. Hosp. & Health Care Servs., Inc.*, 719 N.E.2d 1141, 1147 (Ill. App. Ct. 1999) (no geographic limitation "reasonable where the purpose of the restriction was to protect the employer from losing customers to a former employee…"); *Wolf & Co. v. Waldron*, 366 N.E.2d 603, 605 (Ill. App. Ct. 1977). In addition, Aon has legitimate interests in preventing former employees from soliciting its clients and exploiting its confidential information. *See, e.g., Wessel Co. v. Busa*, 328 N.E.2d 414, 419 (Ill. App. Ct. 1975) ("employer is entitled not to have his old customers enticed away from him."); *Donald McElroy, Inc. v. Delaney*, 389 N.E.2d 1300, 1307 (Ill. App. Ct. 1979).

Likewise, Illinois courts regularly enforce covenants not to solicit employees and protecting trade secrets and confidential information. *See, e.g. Arpac Corp. v. Murray,* 589 N.E.2d 640, 649-50 (Ill. App. Ct. 1992) (enforcing covenant not to solicit employees); *Malone v. Cort Furniture Corp.*, 2002 WL 1874819, at *1-2 (N.D. Ill. Aug. 13, 2002); *Tower Oil & Tech. Co., Inc. v. Buckley*, 425 N.E.2d 1060, 1066 (Ill. App. Ct. 1981) ("employer can utilize a restrictive covenant to protect itself from the disadvantageous use of confidential information.").

Here, as explained above, Heffernan breached all the restrictive covenants in his Stock Agreement, by among other things, coordinating a massive raid to transfer nearly every Aon San Jose employee to Alliant, misappropriating more than 11 MB of confidential data from AonWrap®, and soliciting Aon clients to transfer to Alliant.

### B. Aon Is Likely to Succeed on Breach of Fiduciary Duty and/or Duty of Loyalty Claims Against Heffernan

To prove a claim for breach of fiduciary duty, a plaintiff must show: (1) duty; (2) breach of duty; and (3) injury proximately caused by breach. *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000). Corporate officers, such as Heffernan, owe fiduciary duties to their employer not to (1) actively exploit their positions within the corporation for their own personal benefit or (2) hinder the ability of a corporation to continue the business for which it was developed. *Alpha School Bus Co., Inc. v. Wagner*, 910 N.E.2d 1134, 1149 (1st Dist. 2009). Further, an officer must deal honestly with his employer, disclose any conflicts of interest, and "disclose those facts which he is aware of that threaten the corporation's existence." *Unichem Corp. v. Gurtler*, 498 N.E.2d 724, 728 (Ill. App. Ct. 1986); *Scranton Gillette Comms., Inc. v. Dannhausen*, 1999 WL 558134, at *5 (N.D. Ill. July 27, 1999). Failure to do so is a breach of fiduciary duty. *Unichem Corp.*, 498 N.E.2d at 728; *Scranton Gillette Comms.*, 1999 WL 558134, at *5.

As a senior executive, Heffernan owed fiduciary duties to Aon. Among other things, Heffernan breached his duty to Aon by conspiring with Alliant to orchestrate a mass resignation of Aon's entire San Jose office and commence a raid on Aon's clients. After planning and conspiring with Alliant, Heffernan resigned in a calculated manner and commenced transferring Aon employees to Alliant before Aon could react. Heffernan's actions have severely injured Aon – causing it to lose nearly an entire office within 24 hours.

Further, as a senior executive at Aon, privy to Aon's most confidential strategic, financial and client information, once Heffernan entered into employment negotiations with Alliant, he had a conflict of interest as to his continued dealings with Aon. Heffernan had a duty to disclose his negotiations with Alliant, but failed to do so, breaching his fiduciary duties to Aon. *See, e.g., Aon Risk Servs. v. Cusack.,* 2011 WL 6955890, at *11 (Sup. Ct. N.Y. Co. Dec. 20, 2011); *Unichem Corp.*, 498 N.E.2d at 728; *Scranton Gillette Comms.*, 1999 WL 558134, at *5.

### C. Aon Is Likely to Succeed on Aiding and Abetting Breach of Fiduciary Duty Claims Against Alliant

Alliant is liable for aiding and abetting Heffernan's breaches of his duties to Aon. To prove a claim for aiding and abetting, a party must show: (1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation. *See Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 767 (Ill. App. Ct. 2003).

Alliant was undoubtedly aware of Heffernan's high-level position at Aon and the fact that he owed fiduciary duties to Aon. Further, it is clear Alliant assisted with Heffernan's fiduciary breaches. To transfer more than twenty San Jose employees in a single day, Alliant made advance plans and preparations to onboard and provide workplace infrastructure for what was essentially an entire new Alliant office. Prior to January 2016, Alliant had no office space or operations in San Jose. In preparation for the raid, Alliant, rented temporary office space a block away from Aon, and Alliant top executives, including Peter Arkley, head of Alliant's Construction Services practice, travelled to San Jose to assist with rapidly onboarding Aon's employees in assembly-line fashion. Further, Alliant set up transferred Aon employees with e-mail addresses, offices and phone lines the same day, enabling them to immediately begin

soliciting Aon clients. It would have been impossible for a coordinated departure of this magnitude to have occurred without Alliant's participation and substantial assistance.

As the Supreme Court of New York recognized with respect to both the 2011 and 2014 raids, mass departures of employees do not happen by coincidence:

> The coordinated departure of the Aon executives . . . coupled with a request for a TRO in California within an hour of their resignations [citation omitted], followed by the mass exodus of Aon employees that same day, could not have happened without the prior planning by the former Aon executives and Alliant.

*Aon Risk Servs. v. Cusack*, No. 651673/11, 34 Misc.3d 1205(A), 2011 WL 6955890, at *10 (Sup. Ct., N.Y. Cnty., Dec. 20, 2011).

### D. Aon Is Likely to Succeed on Misappropriation of Trade Secret Claims

To sustain a claim for misappropriation under the Illinois Trade Secrets Act ("ITSA"), 735 ILCS 1065/1 *et seq.*, the plaintiff must show (1) the information at issue was a trade secret, (2) it was misappropriated and (3) it was used in the defendant's business. *See Intertek USA, Inc. v. AmSpec, LLC*, No. 14 CV 6160, 2014 WL 4477933, at *4 (N.D. Ill. Sept. 11, 2014) (citing *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003)). Under the ITSA, a trade secret is information that "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d).

The Court has the power to enjoin both "threatened" and "actual" misappropriation. 735 ILCS 1065/3. Actual misappropriation includes both use and disclosure of trade secrets. *See Intertek*, 2014 WL 4477933, at *5. A plaintiff may prove threatened misappropriation "by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's

trade secrets." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) (enjoining plaintiff's former executive from future use of confidential information in new position).

On the eve of his resignation, Heffernan accessed and downloaded Aon's confidential and proprietary information from the AonWrap® database. He has used this and other information from Aon to compete for Aon's client.[2] This conduct and information clearly qualify as a violation of Aon's trade secret protections. An injunction is appropriate in this situation. *See Intertek*, 2014 WL 4477933, at *5 (granting preliminary injunction where former employee provided trade secret information to his new employer).

### E. Unless Enjoined, Defendants' Conduct Will Irreparably Harm Aon

Alliant's pattern of predatory raids demonstrates that absent injunctive relief, Alliant will continue to commit tortious acts and aid others in breaching their agreements and duties. The New York Appellate Court has previously held that "when not subject to formal judicial restraint [Arkley], has been inclined to solicit Aon's employees and customers, in addition to making apparent use of its proprietary and confidential information." *Aon Risk Servs. v. Cusack, et al*, 102 A.D.3d 461, 463 (N.Y. App. Div. 2013). In the absence of a restraining order, Defendants will continue to solicit Aon's clients and employees and use its confidential information.

Heffernan is causing Aon irreparable harm by wrongfully soliciting Aon employees and clients, breaching his restrictive covenants, misappropriating trade secrets, and damaging Aon's goodwill. Illinois courts routinely finds this type of misconduct gives rise to irreparable harm. *See, e.g.*, *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir.1994) ("injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages"); *Cumulus Radio Corp. v. Olson*, 80 F. Supp. 3d 900, 912 (C.D. Ill.

---

[2] *See* Morra Decl. *¶ 2;* Gotch-Mesa Decl. ¶¶ 24-25; Allard-Flett Decl. ¶ 19.

2015) ("irreparable harm has been presumed in cases where a former insider lures customers away through a competing businesses"); *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006) (loss of "goodwill, competitive position, and continuity of business relationships with [] customers and employees" cannot be cured by monetary damages); *Donald McElroy, Inc. v. Delaney*, 72 Ill. App. 3d 285, 294 (1979) (evidence that the employee acquired confidential information and contacted several customers sufficient for irreparable harm); *McRand, Inc. v. van Beelen*, 138 Ill. App. 3d 1045, 1054 (1985) (solicitations of customers in violation of restrictive covenants constituted irreparable harm). Further, Heffernan agreed in Section 9(f) of the Stock Agreements that any breach of his agreements would irreparably harm Aon, and thus he is contractually barred from disputing the existence of irreparable harm.

### F. The Balance of Hardships Weighs in Aon's Favor and Would Not Harm the Public Interest

The balance of hardships tips in Aon's favor. *See Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509 (7th Cir. 1994). Aon will suffer irreparable harm if Alliant's misconduct is not enjoined. By contrast, maintaining the status quo causes no harm to Defendants. Indeed, prior to its raid, Alliant did not have offices or operations in San Jose. Alliant already has secured the services of over 20 former Aon employees, who previously serviced millions of dollars of revenue at Aon. Further, Heffernan and Alliant and the other transferred employees have commenced soliciting Aon clients. This business rightfully belongs to Aon and not Alliant, but is at risk due to Alliant's unlawful raid.

In addition, to the extent Defendants claim any harm, such harms have been brought about solely by their unlawful conduct, and thus they have no equitable standing to complain should their breaches be enjoined. *See Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc.*, 834 F. Supp.

14

683, 693 (D.N.J. 1993) ("To the extent that the defendants suffer significant, and in a sense irreparable, damage from the granting of the preliminary injunction, this harm is a predictable consequence of their willful breach of contract and their misconduct. As such, it is not the type of harm from which we seek to protect a defendant."); *Dunkin' Donuts Inc. v. Kashi Enters., Inc.*, 106 F. Supp. 2d 1325, 1327 (N.D. Ga. 2000) (no harm to defendant because "injunction would only require that the defendant comply with the . . . Agreement, which it freely entered"). Further, the public interest is also served by preventing Defendants from reaping the benefits of their tortious conduct and breach of contracts. *See, e.g., Caterpillar Inc. v. Jerryco Footwear, Inc.*, 880 F. Supp. 578, 593 (C.D. Ill. 1994) ("The public has an interest in seeing that parties that enter into commercial agreements honor those agreements").

Aon does not seek to prevent those employees who left for Alliant from earning a living or working for Alliant – Aon only seeks to prevent their further theft of Aon's clients, goodwill, business relationships and employees. Alliant remains free to "fairly compete" in the marketplace without misappropriating Aon clients, employees and information. The absence of an injunction permits Alliant and Heffernan to reap the benefits of their unlawful conduct.

### G. Aon Has No Adequate Remedy at Law

For reasons already demonstrated, Aon has no adequate remedy at law. Moreover, Heffernan agreed in the Stock Agreements that Aon "shall be entitled to injunctive relief for a breach of this Agreement by the Participant" because it "will result in irreparable and continuing harm to Aon," and that the loss of services to Aon "cannot be reasonably or adequately be compensated in damages in an action at law." (Stevenson Decl. ¶ 15, Ex. 1 & 2 at §9(f).)

### IV. CONCLUSION

For all of the foregoing reasons, the Court should grant Plaintiff Aon's Motion for a Temporary Restraining Order.

Dated: February 3, 2016

Respectfully submitted,

AON PLC AND AON GROUP, INC.

_____ /s/ John J. Hamill _____
One of Their Attorneys

Shand S. Stephens (*pro hac vice* pending)
Anthony Coles (*pro hac vice* pending)
DLA Piper LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York 10020
T: 212.335.4500
shand.stephens@dlapiper.com
anthony.coles @dlapiper.com

John J. Hamill (ARDC No. 6217530)
Joseph A. Roselius (ARDC No. 6300703)
DLA Piper LLP (US)
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
T: 312.368.4000
john.hamill@dlapiper.com
joseph.roselius@dlapiper.com